UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NIKKI POOSHS,

        Plaintiff,

    v.

PHILIP MORRIS USA, INC., et al.,

        Defendants.

_____/

No. C 04-1221 PJH

**ORDER GRANTING DEFENDANTS'
MOTION TO EXCLUDE EXPERT
TESTIMONY; ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT IN PART AND
DENYING IT IN PART**

Defendants' motion to exclude expert testimony and motion for summary judgment
came on for hearing on August 8, 2012.  Plaintiff Nikki Pooshs appeared by her counsel
John Wallace, Jason M. Rose, and Phyra McCandless; defendant Philip Morris USA, Inc.
("Philip Morris") appeared by its counsel Stanley D. Davis and Jennifer L. Brown; defendant
R.J. Reynolds Tobacco Company ("RJR") appeared by its counsel Peter Larson; and
defendant Hill and Knowlton Strategies, LLC ("H&K" – formerly Hill and Knowlton, Inc.)
appeared by its counsel Stan G. Roman.  Having read the parties' papers and carefully
considered their arguments and the relevant legal authority, the court hereby GRANTS the
motion to exclude expert testimony, and GRANTS the motion for summary judgment in part
and DENIES it in part.

**BACKGROUND**

This is a product liability case, in which plaintiff Nikki Pooshs alleges that she
developed lung cancer as a result of smoking cigarettes produced by cigarette
manufacturers including defendants Philip Morris and RJR ("the manufacturer
defendants"), the sale of which was publicly promoted and advertised by H&K.  Plaintiff
began smoking in 1953 when she was in junior high school, and finally quit smoking in

1   1991.  She was diagnosed with chronic obstructive pulmonary disease in 1989, and again

2   in 1999; with periodontal disease in 1990; and with lung cancer in January 2003.  She filed

3   the present lawsuit in January 2004.

4   In the complaint, plaintiff asserts ten causes of action – negligence, against the

5   manufacturers and H&K; products liability (defective design), against the manufacturers;

6   misrepresentation, against the manufacturers and H&K; fraud and deceit (intentional

7   misrepresentation), against the manufacturers and H&K; fraud and deceit (concealment),

8   against the manufacturers and H&K; fraud and deceit (false promise), against the

9   manufacturers and H&K; fraud and deceit (negligent misrepresentation), against the

10  manufacturers and H&K; concert of action (conspiracy), against the manufacturers and

11  H&K; and pre-1969 failure to warn, and off-label failure to warn, against the manufacturers.

12  Defendants now seek an order pursuant to Federal Rule of Evidence 702 excluding

13  testimony of plaintiff's cigarette-design experts, and an order pursuant to Federal Rule of

14  Civil Procedure 56 granting summary judgment on plaintiff's claims.

**DISCUSSION**

16  A.   Motion to Exclude Expert Testimony

17     1.   Legal Standard

18  A witness who has been qualified as an expert by knowledge, skill, experience,

19  training, or education may give an opinion on scientific, technical, or otherwise specialized

20  topics if (1) the expert's scientific, technical, or other special knowledge will help the trier of

21  fact understand the evidence or determine a fact in issue, (2) the testimony is based upon

22  sufficient facts or data, (3) the testimony is the product of reliable principles and methods,

23  and (4) the witness has applied the principles and methods reliably to the facts of the case."

24  Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

25  The proponent of expert testimony bears the burden of establishing by a

26  preponderance of the evidence that the admissibility requirements are met.  See Fed. R.

27  Evid. 702, Advisory Committee Notes.  Although there is a presumption of admissibility,

28  Daubert, 509 U.S. at 588, the trial court is obliged to act as a "gatekeeper" with regard to

United States District Court

For the Northern District of California

the admission of expert scientific testimony under Rule 702. Id. at 597; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999).

Thus, Daubert requires a two-part analysis. First, the court must determine whether an expert's testimony reflects "scientific knowledge," whether the findings are "derived by the scientific method," and whether the work product is "good science" – that is, whether the testimony is reliable and trustworthy. Daubert, 509 U.S. at 590 & n.9, 593. Second, the court must determine whether the testimony is "relevant to the task at hand." Id. at 597.

Scientific evidence is reliable if it is based on an assertion that is grounded in methods of science – the focus is on principles and methodology, not on conclusions. Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 841 (9th Cir. 2001). In determining whether an expert's reasoning or methodology is scientifically valid, the district court can consider "many factors," including (1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and (4) whether the technique is generally accepted. Daubert, 509 U.S. at 593-95; Fed. R. Evid. 702, 2000 Advisory Committee Notes.

Nevertheless, depending on the type of expert testimony offered, these factors may not be appropriate to assess reliability. Kumho Tire, 526 U.S. at 150. Other factors that might be considered include whether an expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, see General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); or whether an expert has adequately accounted for obvious alternative explanations, see Claar v. Burlington Northern R. Co., 29 F.3d 499, 502 (9th Cir. 1994).

The trial court should be also mindful that reliability is not determined based on the "correctness of the expert's conclusions but the soundness of his methodology." Stilwell v. Smith & Nephew, Inc., 482 F.3d 1187, 1192 (9th Cir. 2007) (quotation omitted). The trial court should ensure the expert "employs in the courtroom the same level of intellectual rigor

3

United States District Court

For the Northern District of California

1  that characterizes the practice of an expert in the relevant field."  Kumho Tire, 526 U.S. at

2  152.

3      Rule 702's second prong concern's relevancy, or "fit."  See Daubert, 509 U.S. at

4  591.  Expert opinion testimony is relevant if the knowledge underlying it has a "valid . . .

5  connection to the pertinent inquiry," and it is reliable if the knowledge underlying it "has a

6  reliable basis in the knowledge and experience of [the relevant] discipline."  Id. at 592;

7  Kumho Tire, 526 U.S. at 149.

8          2.    Defendants' motion

9      Defendants now seek an order excluding the cigarette-design testimony of plaintiff's

10 experts Dr. K. Michael Cummings and Dr. William A. Farone, on the ground that neither is

11 an expert in cigarette design.  This testimony is relevant to plaintiff's second cause of action

12 for products liability, which alleges "defective design."

13     Both Dr. Cummings and Dr. Farone have testified in a number of cases brought by

14 smokers and ex-smokers against cigarette manufacturers, and both appear to be qualified

15 to testify as experts on certain subjects.  However, the  question here is whether their

16 testimony regarding cigarette design is reliable and trustworthy, and relevant to the case.

17          a.    Motion to exclude testimony of Dr. Cummings

18     Dr. K. Michael Cummings is an epidemiologist with a focus on public health. Broadly

19 speaking, epidemiology is the study of the incidence, distribution, and control of disease in

20 a population.  Dr. Cummings has an undergraduate degree in health education, and

21 graduate degrees (including a Ph.D.) in health education and health behavior.

22     Dr. Cummings is currently a Professor in the Department of Psychiatry and

23 Behavioral Sciences and a co-leader of the Tobacco Research Program in the Hollings

24 Cancer Center at the Medical University of South Carolina in Charleston, South Carolina,

25 where he has worked since October 2011.  Prior to that, he worked for thirty years at the

26 Roswell Park Cancer Institute in Buffalo, New York, where he was a senior research

27 scientist and the Chairman of the Department of Human Behavior.  During the same period,

28 he also held the position of Professor in the Department of Social and Preventive Medicine

4

United States District Court

For the Northern District of California

1    at the State University of New York at Buffalo where he taught graduate-level courses.

2         In connection with the present case, Dr. Cummings submitted a report in which he

3    provides opinions "relating to tobacco epidemiology, tobacco use behaviors, consumer risk

4    perceptions, tobacco product marketing, addiction and tobacco documents, specifically the

5    industry conspiracy to belittle the known health risks and addictive nature of cigarette

6    smoking."  To this end, he provides opinions regarding the following:  whether plaintiff was

7    addicted to cigarettes; the marketing of cigarette brands smoked by plaintiff; the cigarette

8    industry's knowledge regarding issues of smoking and health, including the dangers of

9    smoking and addictiveness of cigarettes during the time that plaintiff smoked; and the

10   epidemiological evidence as it pertains to the cause of plaintiff's illnesses.

11        Dr. Cummings states in his report that cigarettes containing nicotine can be

12   addictive; that a "key indicator of addiction" is persistent daily use; and that plaintiff meets

13   this criteria for addiction to nicotine based on evidence that she was a persistent daily

14   smoker for more than 35 years, and that when she switched to a lower-nicotine cigarette,

15   she compensated by smoking more cigarettes.

16        Dr. Cummings states further that cigarettes were designed to have relatively high

17   levels of nicotine so that smokers would smoke them, and that the design of cigarettes was

18   defective because they were engineered to facilitate the easy inhalation of smoke, and

19   because they contain nicotine and can be addictive.  He states that the business records of

20   the cigarette manufacturers show that various brands of cigarettes were engineered in

21   ways that were intended to maintain a smoker's addiction to nicotine which in turn would

22   lead to repeated exposure to the toxins in cigarette smoke.  He located these internal

23   business records of the defendants by "using short-string Boolean-based methodologies."

24   He also searched patents and "published literature."

25        Dr. Cummings states that the manufacturers' product design decisions were made

26   with the explicit purpose of making it difficult for smokers to control their smoking behavior,

27   once they were addicted to nicotine.  He claims that it is "readily apparent" that "safer

28   commercially feasible designs have existed for decades, but have not been widely used

1    because of concerns over profits."  He quotes a statement of a Philip Morris executive to

2    the effect that "a cigarette that does not deliver nicotine cannot satisfy the habituated

3    smoker and cannot lead to habituation, and would therefore almost certainly fail," and

4    opines that this shows that cigarette manufacturers preferred to keep smokers "habituated"

5    rather than changing their design to sell a cigarette that would not habituate the user.

6          Defendants do not object to Dr. Cummings' testimony regarding the bulk of the

7    opinions in his report, but do argue that he should not be permitted to testify regarding

8    cigarette design, because he has no qualifications that would allow him to offer opinions on

9    that subject.  Defendants also assert that his methodology in this regard is not sound, as it

10   consists solely of reviewing various documents that he himself selected, and producing a

11   summary of those documents.  Defendants contend that such testimony would not assist

12   the jury, and that it is not sufficiently reliable to satisfy the requirements of <u>Daubert</u>.

13         In response, plaintiff asserts that Dr. Cummings is qualified to testify on subjects

14   related to his work, which plaintiff characterizes as "the cigarette manufacturers' role in

15   getting young smokers addicted to nicotine in cigarettes, and how [d]efendants have

16   engineered cigarettes to influence smoking behavior."  She claims that Dr. Cummings has

17   devoted his professional career to studying the defendants' internal documents, and has

18   thus been able to reach conclusions regarding the alleged decades-long effort to confuse

19   smokers and potential smokers about the contents of cigarettes, the health consequences

20   associated with long-term cigarette use, the effectiveness of advertising by defendants, and

21   the details of their efforts to convolute the truth about all of these factors.

22         Plaintiff contends that Dr. Cummings is qualified to testify about cigarette design

23   based on the fact that he is one of the nation's foremost experts on nicotine addiction, and

24   cancer prevention as it relates to tobacco epidemiology, tobacco use behaviors, consumer

25   risk perceptions, tobacco product marketing, and "tobacco documents," and the fact that he

26   has received numerous grants for his research, and has published many peer-reviewed

27   scientific papers that directly focus on cigarette design.  Thus, plaintiff argues, Dr.

28   Cummings is well-qualified to testify regarding how variation in product design influences

1   smoking behavior.  She argues further that because Dr. Cummings has provided trial

2   testimony in other cases on the areas on which he has been designated an expert in this

3   case – including cigarette design – he should also be admitted as an expert here.

4        Plaintiff also contends that Dr. Cummings' proffered testimony is reliable, as his

5   expertise in researching the internal and external statements of the tobacco industry to

6   determine what manufacturers knew about the risks of smoking has developed over the

7   past thirteen years.  Over all, plaintiff asserts, Dr. Cummings has more than 30 years'

8   experience and expertise in "tobacco control and research of tobacco industry documents,"

9   and the fact that part of his opinion is based on his having summarized industry documents,

10  which is the type of material that experts in this field would normally rely on.

11       The court finds that the motion must be GRANTED as to Dr. Cummings' cigarette-

12  design opinions.  It is plaintiff's burden to demonstrate the admissibility of her experts'

13  opinions.  As an epidemiologist with expertise in health behavior and the use of cigarettes,

14  including the addictive properties of nicotine and the causes and effects of nicotine

15  addiction, Dr. Cummings is qualified to testify regarding those subjects.  However, plaintiff

16  has failed to establish that Dr. Cummings is qualified to testify about cigarette design.

17       Neither the fact that Dr. Cummings has applied for and sometimes obtained grant

18  money to support tobacco-related research, or the fact that Dr. Cummings has authored

19  numerous papers, is sufficient to establish Dr. Cummings as an expert in cigarette design,

20  unless that research and those papers relate to the subject of cigarette design.  The claim

21  that Dr. Cummings "contributed" to numerous "papers" related to the subject of cigarette

22  design is also meaningless unless plaintiff can establish what form his contributions took.

23  Indeed, Dr. Cummings has conceded that he has no training in cigarette design and that he

24  has never designed a cigarette or a cigarette filter.

25       Dr. Cummings does appear to be qualified, based on his review of the literature, to

26  testify regarding the cigarette industry's knowledge regarding the risks of smoking; and

27  regarding the fact that a cigarette that delivers less nicotine and/or other toxic substances

28  will be less risky to human health; and also regarding how a particular cigarette design

United States District Court

For the Northern District of California

1  might influence smoking behavior.  Nevertheless, since he is not qualified as an expert in

2  how to design cigarettes, his testimony would not assist the trier of fact in understanding or

3  determining whether the design of defendants' cigarettes was in fact defective.  Moreover,

4  because Dr. Cummings is not qualified to testify regarding the cause of plaintiff's cancer, he

5  is also not qualified to provide opinions regarding whether plaintiff could have avoided

6  getting cancer if some alternative design had been available and she had switched to that

7  alternative design.

8                    b.    Motion to exclude testimony of Dr. Farone

9          Dr. William A. Farone is a chemist who worked for Philip Morris between 1976 and

10  1984.  He has undergraduate and graduate degrees in chemistry, and a Ph.D. in physical

11  chemistry.  He also has indicated, however, that he believes that the process of studying

12  for and obtaining a Ph.D. has qualified him to study almost any subject on his own and

13  become an expert on that subject.  He considers his Ph.D. as "a license to do that in any

14  topic I choose as evidenced by the fact that many people have won Nobel prizes in multiple

15  fields, physics, chemistry, peace, economics."  For this reason, he claims "expertise in a

16  wide variety of areas."

17          In his expert report, Dr. Farone describes himself as "a professional scientist with a

18  background in engineering."  He also claims to have "training and experience" in the

19  "cigarette industry."  He worked at Lever Brothers from 1967 to 1976, where he was

20  promoted to the position of Director of Scientific Research; and at Philip Morris USA from

21  1976 to 1984, where he became Director of Applied Research.  In 1984 he left Philip Morris

22  to form Applied Power Concepts, Inc., which "develops and commercializes processes and

23  chemicals for environmental remediation of toxic contamination and alternative energy

24  technology."  He is currently the Chairman of the Board and the Chief Technology Officer of

25  Applied Power Concepts, Inc.   He states that he has published over 80 papers, including

26  some number of papers on "cigarette smoke toxicity and nicotine chemistry."

27          In connection with the present case, Dr. Farone submitted a report in which he

28  provides opinions on the "design decisions that go into the development of cigarettes,"

1  which decisions he categorizes as (1) "[i]ntentional choices about the types of tobacco, the

2  blends, and the portions of the tobacco plant included in the cigarette rod of each brand, as

3  well as the amount of reconstituted tobacco and expanded tobacco[;]" (2) "[i]ntentional

4  technical design choices for the rod and filter of each brand, including the length, diameter,

5  and amount of tobacco in the rod; the type of paper used . . . ; the composition of the filler

6  in the rod and the casings used to hold the rod material together [and] the filter and filter

7  paper, the ventilation of the filter, and the porosity of the filter[;]" (3) "[i]ntentional decisions

8  concerning the use of additives in each brand;" and (4) "[i]ntentional use of nicotine

9  technologies that affect the amount, form and impact of the nicotine in each brand of

10  cigarette[.]"

11       Dr. Farone opines that defendants designed cigarettes in ways that enhanced the

12  effect of nicotine on smokers – claiming that while he was at Philip Morris, it was clear to

13  him that modern cigarettes are designed as meticulously and thoroughly as drug products

14  are by pharmaceutical companies, and that defendants understood the "biochemical and

15  pharmacological properties of [their] products."  He asserts that ensuring delivery of a dose

16  of nicotine sufficient to create and sustain addiction was "a design criterion of the modern

17  cigarette," which was achieved through means such as the "manipulation of nicotine levels

18  via technology[,] . . . decreasing particle size through combustion chemistry[,] . . .

19  increas[ing] inhalability through tobacco processing[,] . . . specification of flavorants,

20  additives, and smoke chemistry[,] . . . development of high-porosity paper . . . and other

21  characteristics to facilitate rapid and repeated product use."

22       Dr. Farone also opines that Philip Morris and RJR had the capability of reducing the

23  level of carcinogens delivered in cigarette smoke, but elected to avoid design options to

24  accomplish this.  He asserts that "[t]he intentional design of cigarettes to create and sustain

25  addiction has a direct, predictable consequence that a majority of current and foreseeable

26  users will suffer premature death and disability from the intended use of the cigarette

27  product[,]" because as smokers become dependent upon nicotine, their ability to stop

28  smoking is diminished significantly.

1    Defendants argue that Dr. Farone should not be permitted to testify as an expert

2    witness.  First, they contend that he is not qualified to offer opinions regarding biochemistry

3    or pharmacology, or to otherwise testify regarding the effect of nicotine on the human body.

4    They note that he has not attended medical school, is not a pharmacologist, and does not

5    hold a degree in pharmacology; that he has never performed any research or published

6    any papers on pharmacology; and that he has never published a paper on nicotine and

7    ammonia.  They also argue that he is not qualified to offer opinions regarding cancer

8    causation, as he is not a toxicologist, an epidemiologist, an oncologist, or a pathologist, and

9    is not board-certified in pulmonology, oncology, molecular biology, or physiology.

10    Defendants assert further that Dr. Farone's proposed opinions on cigarette design

11    are unreliable, because his report does not clearly separate his cigarette-design opinions

12    from his opinions on a number of other topics, such as how defendants should have

13    marketed cigarettes, or his review of various company documents.  Defendants contend

14    that it is difficult to ascertain what Dr. Farone's cigarette-design opinions are, but that to the

15    extent they can be discerned, he appears to opine that cigarette design is flawed because

16    cigarette smoke is "inhalable," because cigarettes deliver a "dose" of nicotine that can

17    cause smokers to become addicted, and because one or more dangerous components

18    could have been removed from cigarette products but were not.

19    Defendants point to two specific opinions expressed by Dr. Farone, and argue that

20    they are particularly unreliable.  First, Dr. Farone opines that ammonia compounds in

21    cigarettes increase the rate of transmission to the brain (by a matter of "milliseconds"), and

22    that this makes cigarettes "defective" because he hypothesizes that it makes them more

23    addictive.  However, defendants assert, because Dr. Farone is not qualified to opine on the

24    issue of addiction in general, or nicotine pharmacology in general, he has no basis for this

25    opinion, and has not provided any scientific basis to support this theory.  Indeed,

26    defendants note, Dr. Farone acknowledges that two recent government-funded studies

27    (funded by the governments of Canada and the Netherlands) have concluded that there is

28    no support for the theory that the addition of ammonia facilitates the rate of absorption.

United States District Court

For the Northern District of California

1   Second, Dr. Farone opines that defendants could have designed cigarettes to

2   reduce various constituents of smoke, in particular "tobacco-specific nitrosamines," but also

3   aldehydes, polyaromatic hydrocarbons, and carbon monoxide.  Defendants assert that

4   these opinions, too, are unreliable, because, Dr. Farone has repeatedly failed to test his

5   hypotheses regarding safer alternative designs, and, in fact, conceded in his deposition that

6   a reduction in tobacco-specific nitrosamines (which he described as "among the worst

7   compounds in tobacco smoke) had not made cigarettes any less harmful.

8   In addition, defendants note, neither Dr. Farone nor any of plaintiff's other experts

9   has shown that even if designs with reduced nicotine or ammonia or other constituents

10   were made available, plaintiff and other smokers would use them instead of traditional

11   cigarettes.  Indeed, defendants assert, plaintiff testified in her deposition that she tried the

12   cigarettes with less nicotine or that used filters that made it harder to draw the smoke, and

13   did not like them.

14   In opposition, plaintiff argues that Dr. Farone is well-qualified to testify as an expert

15   on the topics for which plaintiff will offer him.  First, plaintiff contends that Dr. Farone is

16   qualified to testify regarding addiction and cancer causation as they relate to cigarette

17   design, because he is trained in chemistry and has published prolifically in the areas of

18   physics, chemistry, and biotechnology, and because he holds a number of chemical,

19   electrical, and biotechnology patents.  Plaintiff also contends that based on his experience

20   at Philip Morris and his training and "other experience," Dr. Farone is qualified to testify on

21   the pharmacology of nicotine, addiction, and cancer causation as they relate to cigarette

22   design.  Plaintiff asserts that it is unnecessary that an expert be qualified "based simply on

23   an expert's Ph.D. field," and that Dr. Farone should be considered qualified based on his

24   "renown as an expert in cigarette design."

25   Plaintiff argues further that even if the court accepts defendants' argument that Dr.

26   Farone is not qualified to testify regarding pharmacology, he is nevertheless qualified to

27   testify about the chemistry of nicotine, and what, in his personal experience, Philip Morris

28   and R.J. Reynolds understood about the pharmacology of nicotine.  Similarly, even though

United States District Court
For the Northern District of California

1  Dr. Farone does not treat addiction, plaintiff claims he can be qualified to testify regarding

2  what "defendants" understood about nicotine and addiction and what "it" knew about lung

3  cancer "and its products," and about what actions "defendants" took in response to "its"

4  understanding about nicotine in order to encourage addiction amongst "its" customers.

5      Plaintiff also contends that Dr. Farone's proffered testimony is reliable, based on its

6  acceptance by Philip Morris, the National Cancer Institute, and the Food and Drug

7  Administration, as well as by numerous courts.  As for Dr. Farone's cigarette-design

8  opinions on ammonia and nicotine, plaintiff responds that his prior concession that he is not

9  an expert on nicotine addiction and responses to it is not a concession that he is not an

10  expert on the chemical composition of nicotine.  As for the two government-funded studies

11  that found no connection between ammonia and nicotine absorption rate, plaintiff suggests

12  that those studies are of no account because they were funded by foreign governments.

13      Finally, plaintiff asserts that Dr. Farone's opinions about designs that would have

14  reduced certain smoke constituents are reliable, and that defendants' argument that Dr.

15  Farone has not tested his prototype is unavailing, as the testimony on which it is based

16  comes from a deposition held more than 13 years ago.

17      The court finds that the motion must be GRANTED.  Plaintiff bears the burden of

18  proving the admissibility of her experts' opinions, which she has not done here.  In

19  particular, plaintiff has failed to establish that Dr. Farone is qualified to testify about

20  cigarette design, or about nicotine pharmacology, addiction or cancer causation.

21      Plaintiff appears to be offering Dr. Farone as both an expert witness and a percipient

22  witness (based on his employment at Philip Morris).  However, Dr. Farone's report – which

23  purports to be an expert report – mixes the two types of testimony.  It is thus difficult to tell

24  whether Dr. Farone is basing his opinions on what he witnessed at Philip Morris, or on

25  some scientific reasoning (which in any event, he fails to explain).  While Dr. Farone may of

26  course testify as a percipient witness regarding what he witnessed while he was employed

27  at Philip Morris, the court finds that he is not qualified to offer expert opinions about what

28  Philip Morris "understood" about cigarette design then or at any time.  Moreover, since he

United States District Court

For the Northern District of California

1    never worked for RJR or H&K, he has no personal knowledge of anything that transpired at

2    those companies.

3          As for Dr. Farone's opinions regarding cigarette design – including the opinion that

4    cigarettes are defective because the smoke is "inhalable," because they deliver a "dose" of

5    nicotine that can addict smokers, and because they contain one or more dangerous

6    components that could have been removed but were not – plaintiff has provided no

7    evidence that Dr. Farone has tested his theories, or that his theories are consistent with

8    accepted scientific practices or protocols.  Similarly, Dr. Farone's theories about ammonia

9    and nicotine are not shown to be reliable, particularly in view of the recent research that

10   has refuted these theories.  Dr. Farone has not provided any evidence that he has tested

11   his theories or that they are based on anything other than speculation.

12         As for Dr. Farone's opinions regarding designs he claims would have reduced risk,

13   he has provided no evidence that any testing or studies have been conducted.  It appears

14   to be his opinion that the "prototype" he suggests would have reduced the risk of smoking,

15   but this opinion is not supported by any accepted form of scientific proof.

16         As a chemist with knowledge of the chemistry of tobacco or smoked cigarettes, Dr.

17   Farone is qualified to testify regarding those subjects, to the extent he has addressed them

18   in his report, but not as to the elements or details of any particular cigarette design.

19   Because Dr. Farone appears to have no experience designing cigarettes, or in developing

20   any "feasible alternative design" that would be safer than any other design, he cannot be

21   considered qualified as an expert on cigarette design.

22   B.    Motion for Summary Judgment

23         1.    Legal Standard

24         A party may move for summary judgment on a "claim or defense" or "part of . . . a

25   claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there is

26   no genuine dispute as to any material fact and the moving party is entitled to judgment as a

27   matter of law.  Id.

28         A party seeking summary judgment bears the initial burden of informing the court of

United States District Court

For the Northern District of California

1   the basis for its motion, and of identifying those portions of the pleadings and discovery

2   responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp.

3   v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome

4   of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a

5   material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a

6   verdict for the nonmoving party. Id.

7        Where the moving party will have the burden of proof at trial, it must affirmatively

8   demonstrate that no reasonable trier of fact could find other than for the moving party.

9   Soremekun v.Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

10  the nonmoving party will bear the burden of proof at trial, the moving party can prevail

11  merely by pointing out to the district court that there is an absence of evidence to support

12  the nonmoving party's case. Celotex, 477 U.S. at 324-25.  If the moving party meets its

13  initial burden, the opposing party must then set out specific facts showing a genuine issue

14  for trial in order to defeat the motion. Anderson, 477 U.S. at 250; see also Fed. R. Civ. P.

15  56(c), (e).

16       When deciding a summary judgment motion, a court must view the evidence in the

17  light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

18  Anderson, 477 U.S. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

19       2.    Defendants' Motion

20       Defendants seek summary judgment as to the first through eighth, and tenth causes

21  of action.  They argue that the design defect claims fail because plaintiff cannot prove her

22  injuries were caused by a defect in cigarette design, as distinguished from smoking

23  cigarettes in general; that the fraud claims fail because there is no evidence that plaintiff

24  relied on any particular representation made by defendants; that the concealment and

25  failure-to-warn claims fail because there is no evidence that any statement or warning

26  would have prevented plaintiff's injuries; that the claims asserted against H&K fail because

27  it is immune from liability in tobacco product liability actions; and that the claim for "concert

28  of action" fails because civil conspiracy is not a separate tort under California law.

**United States District Court**
For the Northern District of California

1          1.     Design defect claims

2          "A manufacturer may be held strictly liable for placing a defective product on the

3   market if the plaintiff's injury results from a reasonably foreseeable use of the product."

4   Saller v. Crown Cork & Seal Co., Inc., 187 Cal. App. 4th 1220, 1231 (2010).  Products

5   liability may be premised upon either of two categories of product defects – design defect

6   or manufacturing defect.  Id.; see also McCabe v. American Honda Motor Co., 100 Cal.

7   App. 4th 1111, 1119 (2002).  Here, plaintiff asserts a design defect claim.

8          A design defect exists when the product is built in accordance with its intended

9   specifications, but the design itself is inherently defective.  See Barker v. Lull Eng'g Co., 20

10  Cal. 3d 413, 429 (1978).  The plaintiff bears an initial burden of making "a prima facie

11  showing that the injury was proximately caused by the product's design."  Id. at 431.

12         Defendants argue that summary judgment must be granted as to the defective

13  design claim or claims because plaintiff cannot prove her injuries were caused by a defect

14  in cigarette design, as distinguished from smoking cigarettes in general.  Defendants assert

15  that the testimony of plaintiff's cigarette design experts (Drs. Cummings and Farone) is

16  inadmissible, and that there is no evidence that a defect in the design caused her injuries.

17         The California Supreme Court has recognized two alternative tests for proving a

18  design defect under product liability law:  the "consumer expectations test" and the

19  "risk-benefit test."  Soule v. General Motors Corp., 8 Cal. 4th 548, 566-67 (1994).  In the

20  present case, plaintiff asserts a claim or claims of product liability based on the risk-benefit

21  test.  Under the risk-benefit test, a product's design is defective if the design embodies

22  "excessive preventable danger" – that is, the risk of danger inherent in the design

23  outweighs the benefits of such design.  Barker, 20 Cal. 3d at 430; Ford v. Polaris Indus.,

24  Inc., 139 Cal. App. 4th 755, 766 (2006); see also Soule, 8 Cal. 4th at 562.

25         Nevertheless, regardless of whether the risk-benefit test or the consumer

26  expectations test is being employed, a plaintiff must prove that there was a design defect,

27  which actually caused the injury.  O'Neil v. Crane Co., 53 Cal. 4th 335, 347 (2012); see

28  also Soule, 8 Cal. 4th at 572-73; Barker, 20 Cal. 3d at 431.  The plaintiff must prove these

United States District Court

For the Northern District of California

1   facts through expert testimony.  See Whiteley v. Philip Morris, Inc., 117 Cal. App. 4th 635,

2   701-02 (2004).

3        A plaintiff may also bring a "negligent design" claim.  However, where liability

4   depends on proof of a design defect, there is no practical difference between negligent

5   design and strict liability design.  Lambert v. General Motors, 67 Cal. App. 4th 1179, 1185-

6   86 (1998).  Under both strict liability and negligence, the plaintiff must prove that the defect

7   caused the injury.  Merrill v. Navegar, Inc., 26 Cal. 4th 465, 479 (2001).

8        Here, the court finds that summary judgment must be GRANTED as to the second

9   cause of action for products liability, and also as to the first cause of action for negligence

10  to the extent that the allegation that defendants "negligently manipulated" cigarettes can be

11  construed as a claim of negligent design.

12       The evidence in this case shows that plaintiff smoked cigarettes manufactured by

13  the defendants, and that she developed lung cancer.  However, there is no evidence that

14  the design of defendants' cigarettes – as opposed to plaintiff's smoking of cigarettes – was

15  a substantial factor in causing her lung cancer.  See Whiteley, 117 Cal. App. 4th at 701-02.

16  While cigarettes may be considered generally harmful in the sense that smoking cigarettes

17  can contribute to the development of various diseases, including lung cancer, plaintiff has

18  not met her burden of showing, through admissible evidence, that it was the particular

19  design of defendants' cigarettes that caused her lung cancer.

20       Moreover, the theory that cigarettes are defectively designed because they contain

21  nicotine is unpersuasive.  There is general agreement that it is the nicotine that causes

22  smokers to become addicted, but nicotine is normally present in tobacco.  Similarly, the

23  theory that cigarettes are defectively designed because the smoke from cigarettes is

24  intended to be "inhalable" is untenable, as "inhalable smoke" is an inherent feature of

25  cigarettes.  Taken to its logical conclusion, the argument that cigarettes are defectively

26  designed because they deliver nicotine through the inhalation of smoke, if adopted, would

27  mean that the only remedy for this alleged design defect would be a ban on the

28  manufacture and sale of any cigarettes containing nicotine.

United States District Court

For the Northern District of California

1    However, as the Supreme Court noted (in a different context), "Congress . . . has

2    foreclosed the removal of tobacco products from the market[,]" notwithstanding the general

3    acceptance of the adverse health consequences of using tobacco.  See Food & Drug

4    Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 137-38 (2000).

5         2.    Fraud, concealment, and failure to warn claims

6    Defendants assert that summary judgment must be granted as to the fraud,

7    concealment, and failure-to-warn claims, because plaintiff has insufficient evidence to

8    support the elements of those claims.  Plaintiff asserts four claims of affirmative

9    misrepresentation, in the third, fourth, sixth, and seventh causes of action; a claim of

10   concealment, in the fifth cause of action; and two claims of failure to warn – pre-1969

11   failure to warn and off-label failure to warn, in the ninth and tenth causes of action.[1]

12        a.    Claims of affirmative misrepresentation

13   To establish any of her claims of misrepresentation, plaintiff must prove actual

14   reliance and causation of injury.  See Lazar v. Superior Court, 12 Cal 4th 631, 638 (1996);

15   Mirkin v. Wasserman, 5 Cal. 4th 1082, 1091-92 (1993).  "'Reliance' . . . in the ordinary fraud

16   context" means "reliance on a statement for its truth and accuracy."  Kwikset Corp. v.

17   Superior Court, 51 Cal. 4th 310, 327 n.10 (2011).

18   The court finds that summary judgment must be GRANTED as to the third, fourth,

19   sixth, and seventh causes of action for affirmative misrepresentation, because plaintiff has

20   provided no evidence that she relied on any particular representation made by the

21   defendants.

22   In the complaint, plaintiff cites to only one specific representation regarding the

23   safety of smoking cigarettes.  This is a document that was released/published by various

24   tobacco companies in January 1954 – the "Frank Statement to Cigarette Smokers" – which

25   allegedly appeared in approximately 450 newspapers located in major metropolitan areas

26   across the United States.

27   _____

28        [1] Defendants do not challenge claim of pre-July 1969 failure-to-warn.

17

United States District Court

For the Northern District of California

1    The "Frank Statement," which is reproduced in the complaint, states, among other

2  things, that medical research indicates many possible causes of lung cancer; that

3  authorities do not agree as to what that cause is; that there is no proof that cigarette

4  smoking is one of the causes; that smoking tobacco is relaxing; that tobacco companies

5  are interested in cooperating with "those whose task it is to safeguard the public health;"

6  and that the tobacco companies are joining forces to establish the "Tobacco Industry

7  Research Committee," for the purpose of researching "all phases of tobacco use and

8  health."

9    Plaintiff testified, however, that she did not rely on the "Frank Statement."  Nor has

10  plaintiff provided evidence that she relied on any other affirmative statements by

11  defendants, or that any specific information that was not disclosed would have affected her

12  decisions if she had been aware of it.  In her deposition, plaintiff testified that over the years

13  she had seen/heard representations regarding smoking, and had relied on those

14  representations in deciding to begin smoking and to continue doing so.  Such

15  representations include newspaper articles that assertedly convinced her it was an open

16  question whether there were negative health effects from smoking cigarettes; commercials

17  and advertisements she saw as a child, which she claims persuaded her that smoking

18  would turn her into a mature and independent adult; and statements in advertisements,

19  which she contends convinced her that smoking cigarettes was safe and healthy.

20    Nevertheless, plaintiff was unable to identify any specific misleading statements

21  relating to smoking or health.  At most, her testimony was that various advertisements

22  presented smoking in a way that made it appear attractive or glamorous.  However, such

23  representations are not affirmative statements about the health effects of smoking.

24    There is no evidence that plaintiff relied on any affirmative statement of any

25  defendant, including the statements in the Joint Statement.  Plaintiff alleges in the

26  complaint that "the public" was misled by the Joint Statement, but not that she herself was

27  misled by it.  Nor did she testify that she ever saw it, read it, heard about it, or relied on it.

28  Indeed, she testified that she does not recall having ever read or heard (much less relied

18

United States District Court

For the Northern District of California

1  on) any specific statement regarding smoking and health.

2  Because it is the plaintiff's burden in this case to plead and prove fraud with

3  particularity, she must establish <u>facts</u> that show how, when, where, to whom, and by what

4  means the alleged misrepresentations were tendered.  Fed. R. Civ. P. 9(b); <u>see also</u>

5  <u>Conrad v. Bank of America</u>, 45 Cal. App. 4th 133, 156 (1996).  In addition, a plaintiff cannot

6  oppose a motion for summary judgment (on a fraud claim) on allegations of fraud that were

7  never pled with particularity in the first place.  <u>See</u> <u>Wasco Prods., Inc. v. Southwall Techs.,</u>

8  <u>Inc.</u>, 435 F.3d 989, 990-92 (9th Cir. 2006) (citing cases); <u>Kaplan v. Rose</u>, 49 F.3d 1363,

9  1369-70 (9th Cir. 1994).

10              b.    Claim of concealment

11  As with fraud claims generally, to establish a claim of concealment, plaintiff must

12  prove actual reliance and causation of injury.  <u>See</u> <u>Lazar</u>, 12 Cal 4th at 638; <u>Mirkin</u>, 5 Cal.

13  4th at 1091-92.  For claims alleging fraudulent concealment or omission, a plaintiff shows

14  reliance by proving that had the allegedly omitted information been disclosed, he/she would

15  have acted differently.  <u>See</u> <u>Rivera v. Philip Morris, Inc.</u>, 395 F.3d 1142, 1154-55 (9th Cir.

16  2005); <u>Mirkin</u>, 5 Cal. 4th at 1093.

17  Defendants argue that summary judgment must be granted on the claim of

18  concealment because there is no evidence that plaintiff relied on any particular

19  representation or that she would have acted differently had she been given different or

20  additional information.  In general, defendants assert, plaintiff testified that she chose what

21  brand to smoke based on what brands other people were smoking (her father, her friend's

22  mother), and later, on brands recommended by SmokEnders (a smoking cessation

23  program).  She also testified that she chose cigarette brands because of taste, and smoked

24  filter cigarettes because the filter kept the tobacco bits from getting in her mouth, not

25  because she believed the cigarettes with filters were safer.

26  Defendants argue that given the lack of evidence that plaintiff's decision to smoke –

27  or not to smoke – particular brands of cigarettes was made based on statements made by

28  the tobacco companies, she cannot show that she would have chosen other brands (or

19

United States District Court

For the Northern District of California

1   would have chosen not to smoke) if she had been given other information.

2       Defendants also note that plaintiff has conceded that she received information about

3   the health risks of smoking – such as the information in the 1964 Surgeon General's report

4   that smoking was a cause of fatal illnesses; the recommendation from her doctor in 1964

5   that she not smoke during her first pregnancy; the Labeling Act warnings in the late 1960s;

6   the requests by her children in the early 1970s that she stop smoking; and the information

7   she likely heard in the late 1970s or early 1980s, while she was working in a doctor's office,

8   regarding the health risks of smoking.  Defendants assert, however, that notwithstanding all

9   this input over the years, plaintiff never acted on the warnings about health risks.

10      Based on this, defendants argue that she cannot prove that she would have acted

11  any differently had the cigarette companies provided any additional information about the

12  health effects of smoking at any time during that period.  Plaintiff finally quit smoking in

13  1991, but defendants note that plaintiff's ex-husband, son, and daughter all testified that

14  nothing anyone could have said would have convinced her to quit smoking.

15      In opposition, plaintiff asserts that there is ample evidence that she would have

16  smoked a safer cigarette if defendants had manufactured one.  She points to her

17  participation in the SmokEnders program, and her testimony that while she was in the

18  program she switched to lower-nicotine, lower-tar cigarettes because she believed such

19  cigarettes were healthier.  She also notes that she testified that she routinely checked

20  cigarette packages for nicotine and tar content in an effort to smoke healthier cigarettes.

21      The court finds that the motion must be DENIED as to the fifth cause of action for

22  concealment and the tenth cause of action for failure to warn because triable issues

23  preclude summary judgment.  In particular, disputed issues remain as to whether plaintiff

24  might have made different decisions at various times had she been aware of certain health

25  risks, or whether she would have smoked a "safer" cigarette had defendants manufactured

26  one.

27              c.    Claim of off-label failure to warn

28      California recognizes failure to warn as a species of design defect products liability.

20

United States District Court

For the Northern District of California

1    Saller, 187 Cal. App. 4th at 1238.  "Under the failure-to-warn theory, a product may be

2    defective even though it is manufactured or designed flawlessly."  Id.  Strict liability failure

3    to warn requires the plaintiff to prove that the defendant did not adequately warn of a

4    particular risk that was known or knowable in light of the generally recognized and

5    prevailing best scientific and medical knowledge available at the time of the manufacture

6    and distribution."  Id. at 1239; see also Anderson v. Owens-Corning Fiberglass Corp., 53

7    Cal. 3d 987, 1002 (1991).  The plaintiff must prove that the defendant's failure to warn was

8    a substantial factor in causing his or her injury.  Huitt v. So. California Gas Co., 188 Cal.

9    App. 4th 1586, 1604 (2010).

10        Defendants argue that summary judgment must be granted on the claim of failure to

11   warn because there is no evidence that plaintiff relied on any particular representation or

12   that any statement or warning would have prevented her injuries.  A defendant is not liable

13   for an alleged failure to warn if the evidence shows that "the injury would have occurred

14   even if the defendant had issued adequate warnings."  Id.

15        As with the claim of concealment, defendants contend that plaintiff has no evidence

16   that she would have acted differently had she been given different or additional information.

17   They assert that the evidence shows that plaintiff chose what brand to smoke based on the

18   brands other people were smoking and also based on SmokEnders' recommendations.

19   She also chose cigarette brands because of taste and convenience, not because she

20   believed the cigarettes with filters were safer.  Thus, defendants assert, plaintiff cannot

21   show that she would have chosen other brands (or would have chosen not to smoke) if she

22   had been given other information.

23        Defendants again note that plaintiff received general information about the health

24   risks of smoking from a number of different sources, starting as early as 1964, and that

25   notwithstanding this input over the years, never acted on the warnings about health risks.

26   Based on this, defendants contend that plaintiff cannot show that she would have acted any

27   differently had the cigarette companies provided warnings at any time during that period.

28        As with the claim of concealment, the court finds that the motion must be DENIED

United States District Court

For the Northern District of California

1   as to the failure-to-warn claim because disputed issues of fact remain as to, e.g., whether

2   plaintiff might have made different decisions at various times had she been aware of certain

3   health risks, whether she would have smoked a "safer" cigarette had defendants

4   manufactured one, or whether the alleged failure to warn was a substantial factor in

5   plaintiff's injuries.

6        The court finds further that plaintiff's failure-to-warn and concealment claims which

7   are based on facts after July 1, 1969, are not preempted by the Labeling Act.  The Labeling

8   Act required the placement of warning labels on cigarette packages beginning in 1966.

9   Congress itself drafted the warning language, which it considered "necessary and

10  sufficient" to warn the public.  See 15 U.S.C. § 1333; see also Altria Group, Inc. v. Good,

11  555 U.S. 70, 76-78 (2008).

12       In order that the warnings would be uniform, Congress precluded any warnings on

13  cigarette packages other than the ones it had drafted, and also provided that "[n]o

14  requirement or prohibition based on smoking and health shall be imposed under State law

15  with respect to the advertising or promotion of any cigarettes the packages of which are

16  labeled in conformity with the provisions of this chapter."  15 U.S.C. § 1334(a), (b).  This

17  express preemption, which became effective July 1, 1969, preempts state common law

18  actions that would impose such labeling "requirements or prohibitions" after that date.

19  Cipollone v. Liggett Group, Inc., 505 U.S. 504, 521-23 (1992).

20       Here, defendants note that the ninth cause of action is limited to "pre-1969 failure to

21  warn," but assert that the first cause of action for negligence appears to allege a breach of

22  the duty to warn that is not limited by time.  See Cplt ¶ 29.  Defendants contend that to the

23  extent that plaintiff is attempting to assert a post-1969 claim of failure to warn, that claim is

24  preempted by the Labeling Act.

25       In opposition, plaintiff concedes that claims of post-1969 failure-to-warn through

26  advertising and promotion are preempted.  However, she asserts that neither the ninth

27  cause of action for pre-1969 failure to warn, nor any other cause of action based on facts

28  prior to July 1, 1969, is preempted, because the Labeling Act does not preempt pre-1969

United States District Court

For the Northern District of California

1    claims.  Specifically, she contends that the first cause of action for negligence and the tenth

2    cause of action for off-label failure-to-warn are not preempted, as Cipollone narrowly

3    preempts only post-1969 failure to warn claims through advertising and promotion – and

4    her negligence claim is not a post-1969 failure to warn claim.

5         Under Cipollone, claims of failure-to-warn through advertising and promotion are

6    preempted, as are claims that defendants made statements or used images in cigarette

7    advertising or promotional materials that tended to minimize the health hazards associated

8    with smoking or that tended to glamorize smoking or make it seem attractive or positive.

9    Cipollone, 505 U.S. at 524, 527.  However, a claim of fraudulent concealment or failure-to-

10   warn is not preempted if it relies on a state-law duty to disclose facts though channels of

11   communication other than advertisement or promotion.  Id. at 528.  Thus, to the extent that

12   plaintiff is asserting pre-1969 failure to warn, or post-1969 failure to warn that is based on a

13   duty to disclose facts other than through advertising and promotion, such claims are not

14   preempted and may proceed.

15        3.    Claims asserted against H&K

16        Defendants contend that the claims asserted against H&K (first, and third through

17   eighth causes of action) fail because H&K is immune from liability in tobacco product

18   liability actions.

19        In 1987, the California Legislature enacted former section 1714.45 of California's

20   Civil Code ("the Immunity Statute"), providing that "[i]n a product liability action" a court

21   could not require a manufacturer or seller to pay damages for injuries caused by certain

22   products, including sugar, butter, and tobacco products, that are inherently unsafe and

23   known to be unsafe by the ordinary consumer of that product, except for claims alleging

24   manufacturing defects or breach of express warranty.  Stats.1987, ch. 1498, § 3, p. 5778.

25        Ten years later, the Legislature repealed the Immunity Statute as it applied to

26   manufacturers of tobacco products "and their successors in interest" and to "tobacco

27   industry research organizations" – but not as to "sellers."  Stats.1997, ch. 570, § 1; see

28   Naegele v. R.J. Reynolds Tobacco Co., 28 Cal. 4th 856, 861-62 (2002).  However, the

United States District Court
For the Northern District of California

1     entities targeted by the amendment remain protected for actions during the ten-year period

2     between 1988 and 1998.  Naegele, 28 Cal. 4th at 860.  The Immunity Statute bars all

3     claims "however labeled," and in particular applies to fraud claims as well as more

4     traditional "product liability" claims.  Id. at 863, 867.

5          Defendants contend that because H&K is neither a tobacco manufacturer nor a

6     "tobacco industry research organization," it is protected by the immunity set forth in the

7     statute, and is entitled to summary judgment on all claims.  They assert that the statute, as

8     amended, reflects the Legislature's intent to make clear that tobacco product liability

9     actions could proceed against tobacco manufacturers, their successors, and tobacco

10    industry research organizations, but no one else.  Defendants contend that because H&K is

11    not a tobacco manufacturer or successor, and is not a tobacco industry research

12    organization, it is entitled to immunity.

13         In opposition, plaintiff asserts that H&K is not shielded from liability by Civil Code

14    § 1714.45.  Plaintiff's position is that because this immunity was originally extended only to

15    "manufacturers" and "sellers" of the listed products and not to any other entities, there was

16    never a bar to suing any entity other than a manufacturer or seller of one of the listed

17    products (which included tobacco), and that because H&K is not a manufacturer or a seller

18    of any consumer product, it never was shielded from liability.

19         H&K is a company that is alleged to have "operated as a public relations agent for

20    and on behalf of" the cigarette manufacturer defendants, "fostering smoking . . . as an

21    acceptable social norm and rite of passage into adulthood."  Cplt ¶ 12.  In other words,

22    H&K is alleged to have acted as the agent for the cigarette companies, and to have

23    publicized false information regarding smoking.  H&K is not alleged to have manufactured

24    or sold cigarettes, but (at most) to have aided and abetted the manufacturers.  However,

25    plaintiff nowhere asserts that H&K was acting independently in connection with any of the

26    claims alleged.

27         Section 1714.45 provides immunity from claims that tobacco products are defective

28    (and has been interpreted to include claims of fraud and misrepresentation based on the

United States District Court

For the Northern District of California

1    conduct of the defendants).  Thus, to the extent that H&K was acting as an agent for the

2    manufacturer defendants in connection with the claims alleged in the complaint, it is not

3    immune, and the motion must be DENIED.

4           4.     Claim for "concert of action"

5           Defendants argue that the eighth cause of action for "concert of action" fails because

6    it is in essence a claim for civil conspiracy which cannot be pled as a separate tort under

7    California law.  See Applied Equip Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 510

8    (1994).  Alternatively, defendants argue, under Sindell v. Abbott Labs., 26 Cal. 3d 588

9    (1980), "concert of action" is simply another theory of joint or group liability based on

10   participation in some joint activity, and cannot be applied to facts involving injury by a

11   product.  See id. at 603-06 (injury caused by diethylstilbestrol ("DES")); see also Cadlo v.

12   Owens-Illinois, Inc., 125 Cal. App. 4th 513, 521-22 (2004) (asbestos); Setliff v. E.I. du Pont

13   de Nemours & Co., 32 Cal. App. 4th 1525, 1534-38 (chemical exposures).

14          In opposition, plaintiff argues that under California law, she is entitled to bring a

15   claim for alternative liability.  See Sindell, 26 Cal. 3d at 594-95, 610-11 (alternative liability

16   doctrine of "conspiracy"); Brown v. Superior Court, 44 Cal. 3d 1049-1060-70 (1988)

17   (alternative theories of liability as causes of action).  Plaintiff claims that defendants have

18   misstated California law regarding the applicable recovery theories of liability, such as

19   concert of action and conspiracy, and asserts that the court in Sindell expanded plaintiffs'

20   abilities to recover in product liability actions.  Plaintiff argues that because smoking-caused

21   lung cancer is an "aggregate dose" disease like asbestos-related cancer, she should be

22   able to allege a "concert of action" claim, as her injuries are the direct and proximate result

23   of defendants' "concerted actions."

24          The court finds that defendants' motion must be GRANTED.  Civil conspiracy is not

25   recognized as an independent cause of action in California.  See Applied Equip. Corp., 7

26   Cal. 4th at 510.  Plaintiff's argument appears to be that because she smoked so many

27   different brands of cigarettes, and is unable to identify the manufacturer of the brand or

28   brands that caused her cancer, the defendants can be held liable collectively without proof

United States District Court

For the Northern District of California

1 of causation. Courts refer to this doctrine, variously, as "alternative liability," "industry-wide

2 (or 'enterprise' liability;" "market share liability," "concert of action," and "conspiracy." See

3 Chavers v. Gatke Corp., 107 Cal. App. 4th 606, 609 (2001); see also Sheffield v. Eli Lilli &

4 Co., 144 Cal. App. 3d 583. 593 (1983).

5       "Market share liability" is a doctrine under which "the traditional prerequisite of

6 identifying the manufacturer of the injury-causing product is eliminated when the product is

7 a generic item produced by several manufacturers." Mullen v. Armstrong World Indus.,

8 Inc., 200 Cal. App. 3d 250, 255 n.6 (1988) (quotation and citation omitted). In such cases,

9 the plaintiffs need allege only the "inability to identify the actual manufacturer and join as

10 defendants those manufacturers that compose a 'substantial share' of the market." Id. The

11 plaintiffs then proceed with their case against those members of the industry that are

12 named as defendants. This theory shifts the burden of proof to each manufacturer to prove

13 its innocence. Id.

14       If, after proceeding against the industry in this manner, the plaintiff successfully

15 establishes liability, damages are apportioned among defendants on the basis of each

16 defendant's share of the product market. The resultant "market share liability" imposed

17 thus "approximate[s each manufacturer's] responsibility for the injuries caused by its own

18 products." A defendant can avoid liability only by proving that it did not produce the specific

19 product that harmed the plaintiff. Id.

20       One of the predicates for Sindell liability is that there be no common discernible

21 distinguishing features or characteristics of the instrumentalities produced by the industry

22 defendants. For example, in Sindell, the court emphasized that it was dealing with

23 "fungible goods" – specifically, a drug produced "from an identical formula." Sindell, 26 Cal.

24 3d at 610-11.

25       To date, the "market share" theory of product liability has been held to reach

26 only "fungible goods," and in only two narrow categories – "truly generic" goods, which are

27 produced from an identical formula, such as DES, and "generally fungible" goods such as

28 asbestos products composed of a specific asbestos fiber in a specific percentage. See

United States District Court

For the Northern District of California

1   Wheeler v. Raybestos-Manhattan, 8 Cal. App. 4th 1152, 1156 (1992).  However, products

2   such as those made with friable asbestos used for various purposes in home construction,

3   and which have varying toxicities; latex gloves; and solvents are not fungible products.

4   See, e.g., Mullen, 200 Cal. App. 3d at 257 (friable asbestos products); Kennedy v. Baxter

5   Healthcare Corp., 43 Cal. App. 4th 799, 811-12 (1996) (latex gloves); Setliff, 32 Cal. App.

6   4th at 1536 ("volatile organic compounds" in "paint solvents, strippers, and glue products").

7   　　　Here, plaintiff is attempting to extend "market share liability" from the DES field of

8   Sindell to the tobacco/cigarette industry proceeds on the premise that DES and cigarettes

9   are simple equivalents.  This is far from being the case.  DES is produced according to a

10  specific formula, and (according to the description in Sindell) the result does not differ

11  appreciably from manufacturer to manufacturer.  By contrast, in the present case, plaintiff is

12  asserting that defendants "manipulated" the levels of nicotine (and other chemical

13  substances) in their cigarettes, and that cigarettes are manufactured with different

14  chemicals and other substances added to the tobacco.  For that reason, cigarettes cannot

15  be considered "fungible."

16  　　　Finally, to the extent that plaintiff is attempting to allege a theory of "alternative

17  liability" as first articulated in Summers v. Tice, 33 Cal. 2d 80, 82-86 (1948), that theory is

18  inapplicable because "California courts have applied the alternative liability theory only

19  when all potential tortfeasors have been joined as defendants."  Setliff, 32 Cal. App. 4th at

20  1534-35.

21  　　　5.　　　Argument re findings in DOJ case.

22  　　　Finally, the court addresses plaintiff's argument that the doctrine of nonmutual

23  offensive collateral estoppel/issue preclusion applies in this case to prevent defendants

24  from relitigating issues they have lost in other proceedings.  Specifically, plaintiff asks this

25  court to adopt the findings and holdings of the court in United States of America  v. Philip

26  Morris USA, Inc., 449 F.Supp. 2d 1 (D.D.C. 2006), affirmed in part and vacated in part, 566

27  F.3d 1095 (D.C. Cir. 2009) ("the DOJ case").

28  　　　The cited opinion is a 1560-page district court opinion issued in a RICO case

27

United States District Court
For the Northern District of California

1  brought by the United States Department of Justice against a number of cigarette

2  manufacturers and related entities.  The government sought damages and an injunction,

3  but the damages claims were dismissed and the remaining injunctive claims were decided

4  in a bench trial.  The case concluded with the court entering a broad injunction against the

5  tobacco companies preventing them from continuing to engage in fraud and deception

6  regarding the health risks of smoking.  Plaintiff asserts that because the factual findings

7  and the RICO liability of RJR and Philip Morris were affirmed by the D.C. Circuit,

8  defendants in the present case are collaterally estopped from disputing those findings.[2]

9      In particular, plaintiff seeks to have the following findings established – (1) that RJR

10  and Philip Morris illegally targeted minors to purchase their cigarette products so as to

11  develop a long-term customer base for those products, and falsely denied they had done

12  so through the time of trial in 2005; (2) that RJR and Philip Morris manipulated the nicotine

13  in their cigarette products through the time of trial in 2005 to increase the addictive impact

14  of the cigarettes on their customers, and falsely denied they had done so through the time

15  of trial; and (3) that RJR and Philip Morris, in concert with other tobacco companies and

16  related entities, engaged in a scheme through the time of trial to misrepresent the health

17  hazards and addictive nature of cigarettes so as to maintain market demand for their

18  products and avoid liability to injured smokers.

19      The court is not persuaded that offensive nonmutual collateral estoppel should be

20  applied with regard to the findings in the DOJ case.  "Offensive use of collateral estoppel

21  occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the

22  defendant has previously litigated unsuccessfully in an action with another party."  Pena v.

23  Gardner, 976 F.2d 469, 472 (9th Cir. 1992) (citing Parklane Hosiery Co. v. Shore, 439 U.S.

24  322 (1979)).  In other words, a litigant who was not a party to the prior case (here, the

25

26      _____

27      [2] The requested issue preclusion is "nonmutual" because plaintiff was not a party to the
    prior DOJ case.  By contrast, "mutual" issue preclusion involves the exact same parties from
28  the prior litigation.  Also, the requested form of issue preclusion is "offensive" because plaintiff
    seeks to use the initial case as a sword rather than a shield.

1   plaintiff) can assert collateral estoppel against a litigant who was a party to the prior case

2   (here, defendants) and who lost on the decided issue in the first case.

3       In Parklane Hosiery, the Supreme Court sanctioned the use of offensive nonmutual

4   issue preclusion, but also granted to trial courts "broad discretion to determine when it

5   should be applied."  Id., 439 U.S. at 331.  The application of offensive nonmutual issue

6   preclusion is appropriate only if there was a full and fair opportunity to litigate the identical

7   issue in the prior action, the issue was actually litigated in the prior action, the issue was

8   decided in a final judgment, and the party against whom issue preclusion is asserted was a

9   party or in privity with a party to the prior action.  Syversdon v. Int'l Business Machines

10  Corp., 472 F.3d 1072, 1078 (9th Cir. 2007).  However, as the Court explained in Parklane,

11  these traditional elements are necessary but not sufficient, because the use of non-mutual

12  offensive issue preclusion raises additional policy concerns.  See id. at 1078-79; see

13  also Parklane, 439 U.S. at 331-37.

14      It appears that every court that has been asked to apply offensive nonmutual issue

15  preclusion to the findings in the DOJ case has refused to do so.  This includes state courts

16  in Massachusetts, Missouri, Maine, and Minnesota, and federal district courts in California,

17  New York, and Arizona.  See Shaffer v. R.J. Reynolds Tobacco Co., 860 F.Supp. 2d 991,

18  995-99 (D. Ariz. 2012) (discussing cases).  This court agrees with the reasoning of the

19  court in Shaffer and the decisions cited therein, and finds that reasoning generally

20  applicable here.

21      As an initial matter, the court is not persuaded that it would be fair to give preclusive

22  effect to the findings of the court in the DOJ case, given the numerous other inconsistent

23  judgments, with some favoring tobacco defendants and some favoring plaintiffs – or to

24  apply a preclusive effect based on a single adverse judgment.  Moreover, plaintiff has not

25  shown that the findings at issue were necessary to the judgment in the DOJ case.  Most

26  significantly, the DOJ case was a RICO case tried to the court, and provided only equitable

27  relief; and was not a product liability case tried to a jury, seeking damages (including

28  punitive damages).  Thus, giving preclusive effect to findings issued by the DOJ court

would arguably violate the Seventh Amendment jury trial rights of defendants in this case.

**CONCLUSION**

In accordance with the foregoing, the motion to preclude the design-defect testimony of plaintiff's experts Dr. Cummings and Dr. Farone is GRANTED.  The motion for summary judgment is GRANTED as to the second cause of action for defective design (and to the first cause of action to the extent it alleges negligent design or negligent failure to warn of defective design); to the third, fourth, sixth, and seventh causes of action for fraud; and to the eighth cause of action for concert of action.  The motion is DENIED as to the remaining claims (the fifth cause of action for concealment of health risks of smoking, the first cause of action for negligence to the extent it alleges failure to warn of health risks of smoking, and the tenth cause of action for off-label failure to warn of health risks of smoking).

**IT IS SO ORDERED.**

Dated:  October 22, 2012

_____
PHYLLIS J. HAMILTON
United States District Judge