UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NIKKI POOSHS,

    Plaintiff,

    v.

PHILLIP MORRIS USA, INC., et al.,

    Defendant.
_____/

No. C 04-1221 PJH

**ORDER**

Before the court are the motions of defendants Philip Morris USA ("PM"), R.J. Reynolds Tobacco Company ("RJR"), and Hill and Knowlton, Inc. (now known as Hill & Knowlton Strategies LLC) to exclude the opinions and testimony of four of plaintiff's experts – Dr. Valerie B. Yerger, Robert Johnson, Dr. Allen H. Smith, and Dr. K. Michael Cummings. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby rules as follows.

**DISCUSSION**

A.    Legal Standard

A witness who has been qualified as an expert by knowledge, skill, experience, training, or education may give an opinion on scientific, technical, or otherwise specialized topics if (1) the expert's scientific, technical, or other special knowledge will help the trier of fact understand the evidence or determine a fact in issue, (2) the testimony is based upon sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

The proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the admissibility requirements are met. See Fed. R. Evid. 702, Advisory Committee Notes. Although there is a presumption of admissibility, Daubert, 509 U.S. at 588, the trial court is obliged to act as a "gatekeeper" with regard to the admission of expert scientific testimony under Rule 702. Id. at 597; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999).

Thus, Daubert requires a two-part analysis. The court first determines whether an expert's testimony reflects "scientific knowledge," whether the findings are "derived by the scientific method," and whether the work product is "good science" – that is, whether the testimony is reliable and trustworthy. Daubert, 509 U.S. at 590 & n.9, 593. The court then determines whether the testimony is "relevant to the task at hand." Id. at 597.

Scientific evidence is reliable if it is based on an assertion that is grounded in methods of science – the focus is on principles and methodology, not on conclusions. Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 841 (9th Cir. 2001). In determining whether an expert's reasoning or methodology is scientifically valid, the district court can consider "many factors," including (1) whether a scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community. See Daubert, 509 U.S. at 593-95; Fed. R. Evid. 702, 2000 Advisory Committee Notes; see also Barabin v. AstenJohnson, Inc., __ F.3d __, 2012 WL 5669685 at *2 (9th Cir. Nov. 16, 2012) (citation and quotation omitted).

Nevertheless, depending on the type of expert testimony offered, these factors may not be appropriate to assess reliability. Kumho Tire, 526 U.S. at 150. Other factors that might be considered include whether an expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, see General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); or whether an expert has adequately accounted for obvious alternative explanations, see Claar v. Burlington Northern R. Co., 29 F.3d 499, 502 (9th Cir. 1994).

The trial court should also be mindful that reliability is not determined based on the "correctness of the expert's conclusions but the soundness of his methodology." Stilwell v. Smith & Nephew, Inc., 482 F.3d 1187, 1192 (9th Cir. 2007) (quotation omitted). A methodology may not be reliable if an expert "fail[s] to address and exclude alternative explanations for the data on which he bases his findings" or "reject[s] studies reporting contrary empirical findings." Carnegie Mellon Univ. v. Hoffman-LaRoche, Inc., 55 F.Supp.2d 1024, 1034-35 (N.D. Cal. 1999).

In addition, a court may exclude expert testimony on the ground that an expert's purported methodology fails to explain his final conclusion. Joiner, 522 U.S. at 146 ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). The trial court should ensure the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152. The court should also consider whether an expert prepared his methodology for purposes of litigation, or articulated the methodology before litigation and without any incentive to reach a particular outcome. See Daubert v. Merrell Dow Pharms, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995).

Rule 702's second prong concern's relevancy, or "fit." See Daubert, 509 U.S. at 591. Expert opinion testimony is relevant if the knowledge underlying it has a "valid . . . connection to the pertinent inquiry," and it is reliable if the knowledge underlying it "has a reliable basis in the knowledge and experience of [the relevant] discipline." Id. at 592; Kumho Tire, 526 U.S. at 149.

B. Defendants' Motions

    1. Dr. Valerie B. Yerger

Dr. Yerger was trained as a naturopathic physician, although she does not currently practice in that field. She also has a certificate in counseling, but is not licensed as a psychologist or psychiatrist. Dr. Yerger is currently an Assistant Adjunct Professor of

Social and Behavioral Sciences in the School of Nursing at the University of California, San Francisco ("UCSF"). As an Assistant Adjunct, she has given approximately one lecture per year for the past eight years, on the subject of menthol. She is also on the faculty of the UCSF Center for Tobacco Control Research and Education.

It is not entirely clear what opinions plaintiff retained Dr. Yerger to provide. In her report, Dr. Yerger states that she is an expert in "tobacco documents archival research." UCSF holds a large archive of millions of digitally-stored historical documents relating in some way to tobacco or tobacco research. The document database maintained by UCSF is available on the Internet to anyone who wishes to search it.

Dr. Yerger claims to specialize in searching those documents and "interpreting" what she finds in the documents. She claims that "tobacco documents" are a key resource for tobacco control research, and asserts that she has analyzed tobacco documents "related to attempts by the tobacco industry to engage in various manufacturing and marketing practices over multiple decades."

In her report, Dr. Yerger offers opinions on the following, apparently based on her review of these tobacco documents – (1) that cigarettes are addictive and hazardous when used as intended; (2) that tobacco companies have long known that nicotine is addictive and that smoke delivers carcinogens; (3) that the intention of the "Frank Statement" was to influence public sentiment regarding the tobacco industry; (4) that cigarette companies deliberately "engineered cigarettes" to be an effective "nicotine delivery device," while at the same time marketing cigarettes as "low tar," "light," or "mild" to create the illusion that such cigarettes were "safer;" or adding menthol, which affected the "impact" or "grab" of the cigarettes; (5) that while openly challenging the link between second-hand smoke and lung cancer, PM simultaneously secretly conducted tests of second-hand smoke.

Defendants argue that Dr. Yerger's opinions should be excluded in their entirety. Defendants contend that Dr. Yerger is not qualified to testify as to any of the opinions in her report, and because her opinions are not based on a reliable methodology.

The court finds that the motion must be GRANTED. Dr. Yerger is not qualified as an

expert in researching document archives. She holds no degree in history or social science, has not studied or received a degree in library science, and has never received formal training under a formal curriculum on archival database research. Nor has she explained how she conducted her searches. While she claims that there are "well-developed protocols" for searching documents based on the "snowball technique," she does not explain what those protocols are, and has conceded that the search involves a human element in refining search terms used in the technique that may lead to bias in the document collection process.

Moreover, even were Dr. Yerger qualified as an expert in archival research, that would not qualify her to opine on the subject matter of the documents she finds. Dr. Yerger is not an expert on cigarette design, as she herself admitted in her deposition, and has not conducted any studies to determine, e.g., how tar and nicotine levels can influence smoke inhalation in nicotine delivery, and how additives can facilitate smoke inhalation in nicotine delivery.

Dr. Yerger is not qualified in any scientific discipline that would enable her to render reliable opinions regarding addiction, the addictive qualities of cigarettes, the "adulteration" of cigarettes, the action of nicotine on the human body, the effect on the human body of secondhand smoke, or any of the other topics listed in her report. She does not hold any appointments in UCSF's graduate programs in biochemistry and molecular biology, chemistry and chemical biology, epidemiology and translational science, or the history of health sciences, and has no degree in toxicology, pharmacology, psychiatry, or psychology. There is no evidence that she is familiar with the diagnostic methods used by health professionals to diagnose addiction, and she has conducted no independent scientific investigation regarding the effects of nicotine, has no scientific expertise in nicotine's effects on the human body, and has no opinion on what level of nicotine would not be addictive.

Moreover, testimony "interpreting" cigarette company documents would not assist the jury because those documents speak for themselves.

5

2. Robert W. Johnson

Robert W. Johnson is plaintiff's damages expert. In 1970 he obtained an undergraduate degree in Economics, and in 1973, an MBA from Stanford in Finance and Investments. He is the President of Robert W. Johnson & Associates, located in Los Altos, and specializes in providing expert testimony regarding both non-economic and economic damages. Based on his CV, he has approximately 30 years' experience as a damages expert. He has also published articles on litigation-related economic analysis, and is a founding member of the National Association of Forensic Economists, and a member of the American Economic Association and the Western Economic Association.

Mr. Johnson submitted two expert reports – an "Economic Impact Report," in which he calculates the present cash value of plaintiff's economic damages (but not including medical expenses); and a "Financial Condition Report," in which he "frame[s], in economic terms, the financial condition of" PM and RJR. Defendants argue that both reports should be excluded because Mr. Johnson is not qualified and his opinions are not based on a reliable methodology.

Defendants' first argument is that Mr. Johnson is not qualified to render an opinion regarding the present cash value of plaintiff's economic damages because his Economics degree is an undergraduate degree, and because he has spent most of his career working as a litigation-based damages expert, not as an economist. They also assert that Mr. Johnson has no professional training in either economic loss calculation or in assessing the financial condition of a corporation for purposes of determining an appropriate award of punitive damages.

Defendants also assert that Mr. Johnson's opinions about plaintiff's economic damages are not based on a reliable methodology. Mr. Johnson calculated plaintiff's economic damages based on her anticipated Social Security income, from 2013 through 2027 (a total of $263,520, based on anticipated life expectancy – or $243,765 at present value), plus the value of "household services" for the period 2003 through 2025 (a total of $463,413 – or $453,271 at present value).

6

Defendants assert that Mr. Johnson's economic loss calculation is not reliable because it uses an unreasonably low discount rate, because it assumes plaintiff has been unable to perform any household services since 2003, because it bases the value of household services on a 1982 survey, because it "assumes" that plaintiff will perform the "average" level of household services, and because it "assumes" plaintiff's date of death based only in information provided by counsel.

In their second main argument, defendants contend that the opinion regarding PM's and RJR's "financial condition" is unreliable because it is based solely on numbers obtained from documents publicly filed with the SEC (10-Ks); and because Mr. Johnson did not use any generally accepted criteria or methodology to select which financial statistics to include or not include in his calculations – which potentially incorporate a wide variety of financial statistics (e.g., net sales, net income, cash on hand, executive compensation, cash flows, capital expenditures, available lines of credit, advertising expenditures, stock market values).

In the alternative, defendants argue that the only financial metric relevant to a defendant's ability to pay an award of punitive damages is current net worth. They assert that financial information other than current net worth does not reflect defendants' ability to pay and should be excluded.

In opposition, plaintiff argues that Mr. Johnson is well qualified to provide economic testimony, based on his education, training, and experience. Plaintiff also asserts that Mr. Johnson's methodology is in line with that of other experts in the forensic economics field. Plaintiff contends that all the matters as to which defendants have issues can be addressed in cross-examination, and that there is no basis to exclude Mr. Johnson as an expert.

With regard to the testimony re defendants' "financial condition," plaintiff argues that Mr. Johnson will not be telling the jury how high the punitive damages award can go before it will "bankrupt" the defendants. Rather, plaintiff asserts, he will simply be telling the jury that the defendants have the ability to pay punitive damages and what their financial

7

condition is.

Finally, plaintiff contends that defendants are wrong when they assert that "net worth" is the exclusive measure of a defendant's financial condition. First, plaintiff notes, the CACI jury instruction relevant to punitive damages uses the phrase "financial condition" not the phrase "net worth." Second, plaintiff asserts, California courts have found that "net worth" is subject to manipulation, and is therefore not the only permissible standard for determining ability to pay.

The court finds that the motion must be GRANTED in part and DENIED in part. The court finds that Mr. Johnson is sufficiently qualified to render an opinion on economic damages. Nevertheless, his opinions regarding plaintiff's economic damages are based in part on what appears to be an unreliable assumption – that plaintiff has been totally unable to perform any household services since 2003, and that she will die of cancer at a particular age. The court finds however that this does not provide a basis for exclusion of the opinion, as it goes to the weight of the testimony, and is therefore an appropriate subject for cross-examination.

As for the second part of his opinion, the court agrees with defendants that the opinion regarding PM's and RJR's "financial condition" (based on a wide variety of financial statistics) is unreliable, and is not clearly based on any generally accepted criteria or methodology.

Under California law, three factors are considered relevant in determining whether a punitive damages award is excessive. These are the degree of reprehensibility of the defendant's conduct; the amount of compensatory damages awarded; and the defendant's financial condition or wealth. Neal v. Farmers Ins. Exchange, 21 Cal. 3d 910, 928 (1978); Bullock v. Philip Morris USA, Inc., 159 Cal. App. 4th 655, 690 n.18 (2008).

There is no single required method or standard for determining a defendant's financial condition when evaluating an award of punitive damages. Bankhead v. ArvinMeritor, Inc., 205 Cal. App. 4th 68, 79 (2012). Nevertheless, while it is not the exclusive measure, the defendant's net worth is considered the most common measure of

1  a defendant's financial condition.  See Rufo v. Simpson, 86 Cal. App. 4th 573, 624 (2001).
2  Ultimately, "'[w]hat is required is evidence of the defendant's ability to pay the damage
3  award.'"  Baxter v. Peterson, 150 Cal. App. 4th 673, 680 (2007).  In addition, the
4  defendant's wealth is to be measured as of the time of the trial on punitive damages.
5  Washington v. Farlice, 1 Cal. App. 4th 766, 777 (1991); Zhadan v. Downtown Los Angeles
6  Motor Distributors, Inc., 100 Cal. App. 3d 821, 839 (1979).

7        Here, plaintiff has not provided any reason to conclude that defendants' financial
8  condition in this case should be measured by some other value apart from net worth.  In
9  addition, Mr. Johnson's calculations include financial information going back a number of
10 years, which is not appropriate given that defendants' wealth is to be measured at the time
11 of the trial on punitive damages.  Accordingly, Mr. Johnson will be permitted to testify only
12 as to the "default" measure of defendants' financial condition – current net worth.

13       3.     Dr. Allen H. Smith

14       Dr. Allen H. Smith is an epidemiologist.  According to the American Heritage
15 Dictionary, and epidemiologist deals with "causes, distribution, and control of diseases in
16 populations" (not individuals).

17       Dr. Smith received an undergraduate degree in mathematics, with a minor in
18 chemistry in New Zealand in 1964, and a second undergraduate degree in New Zealand in
19 "medicine" in 1969.  He has a graduate degree (1970), also from a New Zealand university,
20 which his CV states is the equivalent of an "M.D." in the United States, as well as a Ph.D.
21 (1975) (not clear in what discipline, but something to do with epidemiology).  Dr. Smith has
22 never practiced clinical medicine in the United States, from choice.

23       Since obtaining his Ph.D. he has worked as a researcher and teacher (lecturer,
24 professor) and also as a consultant, in various places in the U.S. and around the world.  He
25 currently has an appointment as a Professor of Epidemiology at the U.C. Berkeley School
26 of Public Health, where he supervises graduate students.  His CV reflects that he has
27 published extensively, primarily on topics related to arsenic epidemiology.

28       Dr. Smith was retained to offer an opinion as to whether plaintiff's lung cancer was

9

caused by smoking, and has done so in his expert report and in his supplemental expert report. Among other things, he concludes that "scientific evidence over many years has established that smoking is the main cause of lung cancer worldwide," that "plaintiff was a cigarette smoker over many years," and that "smoking caused her lung cancer."

Defendants argue that Dr. Smith is not qualified to offer any such opinion, because he is not licensed to treat patients and has not treated any patients for more than 30 years, is not a medical expert, and his opinion about the cause of plaintiff's lung cancer is outside his expertise as an epidemiologist. Defendants also assert that Dr. Smith arrived at his conclusion that smoking caused plaintiff's lung cancer by drawing inferences, not by using medical science. They contend that he did not take into account plaintiff's clinical history, and instead testified that one can make a valid inference from a study without having the specific data.

Defendants note that the court has already ruled that Dr. Cummings, also an epidemiologist, is not qualified to testify regarding the cause of plaintiff's cancer, and that the same ruling ought to be applied to Dr. Smith, who has a similar background to Dr. Cummings, though a much less extensive expert report. Defendants also argue that the court should strike Dr. Smith's supplemental report as untimely.

To the extent that Dr. Smith intends to opine that smoking caused plaintiff's lung cancer, the motion is GRANTED. Dr. Smith is an epidemiologist, not a practicing medical doctor, and at most could testify that in his opinion it is likely (based on statistics) that smoking contributed to the development of plaintiff's lung cancer. Dr. Smith is plainly qualified to testify regarding statistics and the established body of peer-reviewed research and studies linking smoking and lung cancer (or as to any other of his opinions that fall within the category of "epidemiology of cancer").

However, to the extent that any of these opinions were not disclosed in Dr. Smith's original report, and were disclosed only in the supplemental report submitted on November 6, 2012, more than six months after expert discovery cutoff, Dr. Smith will not be permitted to offer such opinions at trial.

### 4. Dr. K. Michael Cummings

Dr. K. Michael Cummings is an epidemiologist with a focus on public health. He has an undergraduate degree in health education, and graduate degrees (including a Ph.D.) in health education and health behavior.

Dr. Cummings is currently a Professor in the Department of Psychiatry and Behavioral Sciences and a co-leader of the Tobacco Research Program in the Hollings Cancer Center at the Medical University of South Carolina in Charleston, South Carolina, where he has worked since October 2011. Prior to that, he worked for thirty years at the Roswell Park Cancer Institute in Buffalo, New York, where he was a senior research scientist and the Chairman of the Department of Human Behavior. During the same period, he also held the position of Professor in the Department of Social and Preventive Medicine at the State University of New York at Buffalo where he taught graduate-level courses. He has authored (alone or with others) several hundred peer-reviewed articles.

In connection with the present case, Dr. Cummings submitted a report in which he provides opinions "relating to tobacco epidemiology, tobacco use behaviors, consumer risk perceptions, tobacco product marketing, addiction and tobacco documents, specifically the industry conspiracy to belittle the known health risks and addictive nature of cigarette smoking." Specifically, he provides opinions regarding whether plaintiff was addicted to cigarettes; the marketing of cigarette brands smoked by plaintiff; the cigarette industry's knowledge regarding issues of smoking and health, including the dangers of smoking and addictiveness of cigarettes during the time that plaintiff smoked; and the epidemiological evidence as it pertains to the cause of plaintiff's illnesses.

In a motion filed in conjunction with their motion for summary judgment, defendants moved to exclude Dr. Cummings' "cigarette design" testimony. The motion was granted. Now defendants seek to exclude Dr. Cummings' opinions in four categories – opinions regarding advertising and marketing of cigarettes; opinions regarding addiction, including nicotine addiction; opinions regarding risk perception and consumer awareness; and opinions regarding what defendants "knew" or "believed."

With regard to the opinions regarding marketing and advertising, defendants note that Dr. Cummings testified that he was not an expert on advertising or marketing practices or their effects, as he has never studied marketing or advertising, never studied consumer marketing in a graduate school setting, never designed an advertising campaign for a commercial product, and never worked for any advertising, marketing, or public relation companies, and does not belong to any professional or academic organizations in the field of advertising or marketing. As for his proposed testimony regarding the effect of advertising on consumers and especially on young people, defendants assert that this testimony should be excluded because Dr. Cummings is not an expert in human behavior, including consumer behavior or child psychology, and that he lacks the required background and training in those subjects. Defendants also assert that these opinions do not rest on a reliable foundation.

With regard to Dr. Cummings' opinions regarding addiction, defendants assert that any such opinions cannot be relevant, because plaintiff has clearly indicated that she is not seeking any compensation for addiction. In any event, defendants argue, Dr. Cummings testified that he is not a medical doctor, and so cannot give a medical diagnosis of addiction or prescribe medications to help people with addictions, and that he is not a licensed psychologist. Thus, defendants assert, Dr. Cummings is not qualified to testify regarding addiction or to opine that nicotine addiction was a substantial contributing factor to plaintiff's lung cancer.

Defendants also assert that Dr. Cummings' opinions regarding addiction do not rest on a reliable foundation. He admitted that there are peer-reviewed and generally accepted methods to diagnose addiction, but defendants claim that he testified that he does not use any of them, but instead simply assumes that anyone who smokes every day must be addicted. Defendants contend that he testified that plaintiff was addicted as soon as she became a regular daily smoker, not when she met any recognized criteria for addiction.

With regard to Dr. Cummings' opinions regarding risk perception and consumer awareness, defendants assert that Dr. Cummings lacks experience or training in the

12

relevant disciplines (survey techniques, history, sociology, psychology, psychiatry); and that his methodology is unreliable, because his opinion that plaintiff was not adequately warned about the risks of smoking is independent of anything he knows about the case and because he supports his opinion primarily by pointing to documents that speak for themselves.

Finally, defendants argue that Dr. Cummings' February 2012 phone interview with plaintiff does not render his opinions admissible. Defendants also object to an affidavit that plaintiff filed in opposition to defendants' summary judgment motion, in which plaintiff asserts Dr. Cummings made a late effort to supplement his prior opinions (including by citing to information obtained during the February 4, 2012 interview between Dr. Cummings and plaintiff). Defendants objected to his affidavit in their reply brief, on the basis that plaintiff was not free to supplement Dr. Cummings' report after the close of discovery. Defendants argue that this new affidavit (which is not part of the present motion) should be disregarded.

In opposition, plaintiff asserts that Dr. Cummings is well-qualified to testify as to the subjects identified in defendants' motion. She contends that Dr. Cummings is well-qualified to testify regarding advertising/marketing because he has taken marketing courses in his graduate training, specifically focused on running public health education campaigns, and has also taught courses on health communications and marketing to graduate students at the University of Buffalo.

Plaintiff asserts that Dr. Cummings also designs media campaigns related to tobacco, its hazards, and methods to quit smoking; has received grants for the purpose of looking at the issue of marketing tobacco products, especially to youth; and has published peer-reviewed articles on cigarette advertising and marketing. In addition, as an epidemiologist, he testifies on the relationship between marketing and public health. Plaintiff argues that Dr. Cummings' advertising and marketing opinions rest on a well-established, reliable foundation, including original data from his own research, published articles, review of internal documents of cigarette companies, testimony of cigarette

13

company officials, and advertisements from cigarette companies.

With regard to the testimony on addiction, plaintiff asserts that Dr. Cummings is one of the foremost experts on nicotine addiction in the country, as his research has focused primarily on the health effects of tobacco, smoking cessation, and tobacco use prevention. Plaintiff contends that Dr. Cummings gained this expertise based on his education, training, and experience as an epidemiologist and public health expert, and has combined that knowledge with the practical reality of helping thousands of addicted smokers quit, as the director of a leading smoking cessation clinic. He has trained medical doctors as well as medical and dental students and other health professionals on how to assess nicotine dependence, and has published numerous articles (in peer-reviewed publications) on nicotine addiction.

With regard to "risk perception and public awareness," plaintiff asserts that this category of expertise goes hand-in-hand with "advertising/marketing." Dr. Cummings has done specific research and written articles regarding consumers' awareness of the health risks of smoking, and plaintiff contends that "it would be hard to conceive of anyone in the United States being more qualified to render opinions regarding the internal tobacco company archives anywhere."

Dr. Cummings issued a supplemental report on November 7, 2012 (the day before plaintiff filed her opposition to the present motion – and which supplemental report defendants argue was untimely) in which he purports to clarify the bases of his opinions, and in which he asserts that he has done research and served on expert committees on the subject of cigarette design and smoking behavior, and that that work has allowed him to understand what information was possessed by consumers and what the tobacco companies knew about the health risks of their products. Plaintiff asserts that Dr. Cummings' familiarity with the tobacco company documents will enable him to assist the jury in understanding the issues in this case.

Fourth, on the related subject of whether Dr. Cummings is qualified to testify regarding what tobacco company officials knew or did not know at a particular time, based

14

on the previously "secret" tobacco company documents, plaintiff responds that Dr. Cummings is not trying to "get into the head" of the author of any particular tobacco company document, but asserts that "he has reviewed so many documents that he has seen explanations of motivations and intent." Plaintiff claims that based on his review of these documents, Dr. Cummings has developed an expertise that it would take the jury "years, if not decades" to develop because the members of the jury would need to become similarly familiar with the documents. Plaintiff contends that Dr. Cummings' role will be to provide "context" for the tobacco industry documents, and that the documents "will speak for themselves within context."

Finally, on the subject of whether Dr. Cummings' supplemental report and declaration filed with plaintiff's opposition to the motion for summary judgment were "properly disclosed," plaintiff asserts that Dr. Cummings' opinions were properly disclosed, and that in any event, if defendants seek to exclude this evidence, a motion in limine is the proper vehicle, not a Daubert motion.

The motion is GRANTED in part and DENIED in part. With regard to the "advertising/marketing" category of testimony, the court finds that despite not having a marketing degree, Dr. Cummings is qualified, by education, experience, and training, to opine regarding advertising and marketing in the area of public health. He can be designated as an expert in this limited area without also being an expert in the total universe of commercial marketing and advertising. Defendants' objections to Dr. Cummings' opinions appear to go more to the weight of the evidence, rather than to whether the opinions are admissible. Nevertheless, Dr. Cummings' testimony in this regard will be limited to testimony relevant to the failure-to-warn and concealment claims, and cannot be used by plaintiff as part of an effort to indict the entire tobacco industry.

With regard to the "addiction" category, the court finds that Dr. Cummings is qualified by education, experience and training to testify about nicotine addiction and methods of assessing it. Thus, based on his expertise, he would also be qualified to consider the known facts about plaintiff's smoking history, and render an opinion whether

15

she fits into the "addicted to nicotine" category. However, plaintiff is not seeking compensation for nicotine addiction, and any testimony regarding plaintiff's alleged addiction would therefore be of marginal relevance.

With regard to the "risk perception/consumer awareness" category, the court will not permit Dr. Cummings to testify solely as a "summarizer" of documents. While Dr. Cummings' experience with the tobacco company documents might be relevant to some issue regarding organizing, digitalizing, or indexing documents, it is not relevant to a professed ability to determine the knowledge and intent of corporations. To the extent that the documents discuss complex scientific theories, and that information is within Dr. Cummings' area of expertise, the court would permit the testimony. However, the court will not permit testimony purporting to "interpret" what the authors of the documents had in mind when they wrote them (or what PM or RJR "intended" at the time).

Finally, with regard to the admissibility of information obtained from Dr. Cummings' February 4, 2012 interview with plaintiff, and Dr. Cummings' November 2012 supplemental expert report, the court agrees with defendants that the supplemental report was untimely. Accordingly, no opinions or testimony based on this report will be permitted, including regarding the February 2012 interview of plaintiff.

**IT IS SO ORDERED.**

Dated: December 5, 2012

_____
PHYLLIS J. HAMILTON
United States District Judge